669 P.2d 1092

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Clifford Paul SIMONSON,
Defendant-Appellant.**

No. 14637.

Supreme Court of New Mexico.

Sept. 23, 1983.

Janet Clow, Public Defender, David Stafford, Asst. Appellate Defender, Santa Fe, Bruce A. Kelly, Albuquerque, for defendant-appellant.

Paul Bardacke, Atty. Gen., Heidi Topp Brooks, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

RIORDAN, Justice.

Clifford Paul Simonson (Simonson) was convicted of two counts of first degree murder for which he received two life sentences, and was convicted of one count of attempted murder for which he received nine years. Simonson appeals. We affirm.

The issues on appeal are:

I. Whether Simonson was denied his right to a fair trial when the trial court questioned prospective jurors during voir dire about their views on capital punishment, prior to any determination of guilt, and excused for cause those jurors who were automatically opposed to the death sentence.

II. Whether the trial court erred in not granting a mistrial after the jury heard inadmissible testimony that Simonson planned to claim insanity if he ever killed anyone.

III. Whether Bob Gillespie's rebuttal testimony contradicting Simonson's defense of insanity, was improper rebuttal testimony.

IV. Whether the trial court erred in refusing a request for an instruction on aggravated battery as a lesser included offense of attempted murder.

On March 12, 1982, Simonson left his place of employment at 10:20 p.m., before his shift was over, after complaining that he was ill. Approximately 2½ hours later, at 1:00 a.m., March 13, 1982, Simonson returned to his place of employment. A co-worker of Simonson, Tom Killingsworth (Killingsworth), noticed Simonson and got into Simonson's truck. Upon entering the

truck, Killingsworth noticed that Simonson had a shotgun and a holstered pistol. Killingsworth testified that Simonson stated, "I'm going to kill Maruch, * * * and I'll have to shoot Howard, too, because Howard will be a witness and I can't have no witness." Killingsworth thought he was joking, but when Charles Maruch (Maruch) drove his truck by, Simonson got out of his truck and fired at Maruch. Simonson then shot at Howard Rhoades (Rhoades) and Miguel Giron (Giron).

Rhoades and Giron died of gunshot wounds to their heads and abdomen. Maruch was shot in the shoulder and survived.

Rhoades, Giron and Maruch were all supervisors at Simonson's place of employment. Simonson apparently was having work disputes with Maruch, but was having no trouble with Rhoades and Giron.

The State presented evidence that Simonson was not insane and that Simonson told Killingsworth that he could shoot anyone he wanted because everyone would think he was crazy due to his previously being stationed in Vietnam. Also, another supervisor testified that Simonson stated to him that, "he could kill people and claim insanity because he'd been sprayed with Agent Orange."

Simonson offered evidence that he was insane at the time of the killing due to mental health problems resulting from his being stationed in Vietnam. However, the jury rejected the insanity defense and Simonson was convicted of the first degree murders of Giron and Rhoades. NMSA 1978, § 30–2–1(A) (Cum.Supp.1982). Although the jury found the aggravating circumstance of NMSA 1978, Section 31–20A–5(G) (Repl.Pamp.1981), for both the murder of Giron and for the murder of Rhoades, they did not impose the death penalty. Instead, Simonson received two life sentences. As to Maruch, Simonson was convicted of attempted murder with a firearm. NMSA 1978, § 30–28–1 and NMSA 1978, § 31–18–16 (Repl.Pamp.1981).

## I. *Juror Selection*

During voir dire, because the possibility of a death sentence was involved, each prospective juror was asked the three questions recommended in NMSA 1978, UJI Crim. 1.10 (Repl.Pamp.1982). The three questions are as follows:

In this case, the penalty of death may be imposed if the defendant is found guilty of the crime with which he is charged. I am going to ask you specific questions concerning your view of the death penalty. I ask that each of you answer the questions either 'yes' or 'no.' If you do not understand the questions, do not hesitate to tell me and I will repeat the question which you do not understand.

[1.] Do you oppose, for any reason, the imposition of the death penalty?

[2.] Because of your opposition to the death penalty, would you, regardless of the facts and circumstances which may be presented by the evidence during the trial, automatically refuse to vote for a verdict of guilty?

[3.] If you find the defendant guilty, would you, regardless of the facts and circumstances which may be presented by the evidence during the trial and the sentencing proceeding automatically refuse to vote for the sentence of death? [Footnotes omitted.]

Of the sixty-four prospective jurors, seven prospective jurors [1] were dismissed for cause because they answered yes to questions one and three.

Simonson argues that the trial court erred in excusing from the guilt-innocence phase, those jurors who were opposed to the death penalty. We have already addressed this issue in the recently decided cases of *State v. Hutchinson,* 99 N.M. 616, 661 P.2d 1315 (1983) and *State v. Trujillo,* 99 N.M. 251, 657 P.2d 107 (1982).

In *Hutchinson,* we noted that under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), a prospec-

---

1. One of the seven jurors was dismissed because of her views on the death penalty and because her son was serving a sentence at the New Mexico State Penitentiary.

tive juror who simply voices general objection to the death penalty or expresses conscientious or religious scruples against its infliction cannot be excused for cause. Nevertheless, we also noted the more recent United States Supreme Court case of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), holding that a prospective juror *can* be excluded if he or she is unable or unwilling to address the death penalty question with a degree of impartiality. Therefore, we held that as to jurors, "a State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *State v. Hutchinson,* 99 N.M. at 620, 661 P.2d at 1319 (citation omitted).

We find that the trial court did not err in excusing the seven jurors for cause because their beliefs on capital punishment would have lead them to ignore their oath as a juror.

We are compelled to point out problems that may result by not excusing jurors pursuant to the questioning of UJI 1.10 and instead having a very large jury panel hearing all the evidence on the guilt phase only later to be excluded at the sentencing phase. If such a result occurred, UJI 1.10 would have to be changed to ask the jurors if they could convict a defendant knowing that some other person could then impose a penalty of death based upon that conviction. There would also have to be new guidelines adopted to establish the manner in selecting the jurors for the sentencing phase. In addition, the matter of challenges, now set by statute, would have to be changed by court rule. These are only some of the potential problems that would be raised by the procedure Simonson suggests. As we have done in previous opinions, we again emphatically and unequivocally reject Simonson's argument. *State v. Hutchinson; State v. Trujillo.*

## II. *Inadmissible Testimony*

In rebuttal, the State called Dr. Arthur Egelman (Egelman), a psychiatrist, as an expert witness who had worked with a number of Vietnam veterans. During examination by the State, Egelman testified on the substance of an interview he had with Killingsworth. In response to a question, Egelman testified from his notes quoting a statement that Killingsworth had made to him:

I asked [Killingsworth] if [Simonson] had ever talked crazy, and [Killingsworth] said that Simonson had talked about shooting people before and I told him to punch them out, not shoot them. And [Simonson] remarked that if he ever did anything like that, they would never convict him because, they'd think he was crazy because he'd been in Vietnam and was exposed to Agent Orange. He [Killingsworth] says that this happened a few months before [the shootings] happened.

Simonson objected and moved for a mistrial because the statement that Egelman made was not given to the defense until the morning of Egelman's testimony; therefore, Simonson did not have an opportunity to cross-examine Killingsworth about the statement. Also, Killingsworth did not testify to this statement during his examination.

Prior to trial, the State had previously given the defense everything they had received from Egelman. After Egelman's testimony, Egelman was questioned both by the State and the defense, out of the presence of the jury. Egelman stated that he had given his notes containing Killingsworth's statement to the State that morning. At which time, the State testified that they immediately turned a copy of Egelman's notes over to the defense. During the questioning of Egelman out of the jury's presence, it was also discovered that after the trial started and NMSA 1978, Evid.Rule 615 had been invoked, Egelman had interviewed Killingsworth. Simonson, therefore, objected to Egelman's testimony and asked for a mistrial because the defense had been denied a chance to depose or evaluate the notes in preparation for trial and because Rule 615 had been violated.

The trial court denied the request for mistrial but immediately struck the testi-

mony and admonished the jury, stating that:

> I would instruct the jury at this time they are to disregard any testimony that Dr. Egelman has given today that deals with the substance of his conversation with Mr. Killingsworth * * * and any statements [he] made to the doctor.

A second cautionary instruction was given by the trial court during instructions to the jury, in which the trial court stated that the testimony should not enter into their deliberations.

However, Simonson asserts that the testimony was so prejudicial that in spite of any admonition to the jury, the jury could not disregard the testimony during deliberations.

█ The general rule in New Mexico, concerning striking improper testimony is that:

> [W]hen improper evidence is introduced, objected to and withdrawn from the consideration of a jury with later instruction to disregard such testimony, the withdrawing and admonition cure any prejudicial effect the evidence might have had.

*State v. Ferguson,* 77 N.M. 441, 444, 423 P.2d 872, 874 (1967) (citations omitted).

Simonson argues *State v. Rowell,* 77 N.M. 124, 419 P.2d 966 (1966), in which the Court found that an admonition to the jury did not cure inadmissable testimony. However, in *Rowell* it appears that the prosecutor deliberately asked a question concerning subject matter which the prosecutor knew was improper. This is not the situation in Simonson's case and is therefore distinguishable.

The overwhelming New Mexico case law states that the prompt sustaining of the objection and an admonition to disregard the answer cures any prejudicial effect of inadmissible testimony. *State v. Vialpando,* 93 N.M. 289, 599 P.2d 1086 (Ct.App.), *cert. denied,* 93 N.M. 172, 598 P.2d 215 (1979); *State v. King,* 90 N.M. 377, 563 P.2d 1170 (Ct.App.1977); *State v. Baca,* 81 N.M. 686, 472 P.2d 651 (Ct.App.), *cert. denied,* 81 N.M. 721, 472 P.2d 984 (1970).

█ Therefore, since the granting of a mistrial is discretionary with the trial court, we will not disturb the decision on appeal absent an abuse of discretion. *State v. Ewing,* 97 N.M. 484, 641 P.2d 515 (Ct.App. 1982). An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. *State v. Brown,* 91 N.M. 320, 573 P.2d 675 (Ct.App.1977), *cert. quashed,* 91 N.M. 349, 573 P.2d 1204, *cert. denied,* 436 U.S. 928, 98 S.Ct. 2826, 56 L.Ed.2d 772 (1978). After reviewing the record, we find that the trial court did not abuse its discretion denying the motion for a mistrial.

Simonson also asserts that Egelman violated Rule 615, which states:

> At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses * * *.

█ At the beginning of Simonson's trial, Rule 615 was invoked which required witnesses to leave the courtroom and remain outside the courtroom until that particular witness was called to testify. *State v. Barboa,* 84 N.M. 675, 506 P.2d 1222 (Ct.App. 1973). As a part of this rule, a witness is prohibited from talking to another witness. *State v. Kijowski,* 85 N.M. 549, 514 P.2d 306 (Ct.App.1973). The purpose of this rule for excluding witnesses is to give the adverse party an opportunity to expose inconsistencies in witnesses' testimony and to prevent the possibility of one witness shaping his testimony to match that given by another witness at trial. *State v. Ortiz,* 88 N.M. 370, 540 P.2d 850 (Ct.App.1975).

█ Permitting a witness to testify who had violated the rule is within the discretion of the trial court. *State v. Kijowski.* In view of the fact that Egelman was an expert and was not a witness to the shooting, we hold that the trial court did not abuse its discretion in allowing Egelman to testify.

### III. Rebuttal Testimony

In the defense's opening statement and during the defense's case, Simonson admit-

ted the crimes charged and argued that he was temporarily insane at the time of the incident as a result of his experiences while stationed in Vietnam. As part of the State's case-in-chief, the trial court allowed the questioning of witnesses regarding Simonson's behavior.

On rebuttal by the State, the State called Simonson's co-worker, Bob Gillespie (Gillespie), who testified that:

> Paul [Simonson] made a statement to me that he could kill anybody down there he wanted to. I asked him how he felt like he could do that, and he said, 'because I was sprayed with Agent Orange in Vietnam and I'd claim insanity.'

Simonson objected to the statement on the ground that the statement was improper rebuttal testimony because the State had the opportunity to question witnesses about Simonson's behavior in their case-in-chief and Gillespie should have been called then. ■ Genuine rebuttal evidence consists of evidence on new matters asserted in the defense's case. *State v. Manus,* 93 N.M. 95, 597 P.2d 280 (1979). Ascertaining whether the rebuttal evidence is in response to new matters established by the defense, however, is a difficult matter at times. Frequently true rebuttal evidence, in some degree, will overlap and coincide with the evidence in the State's case-in-chief. *Id.*

Simonson stated in his opening statement that he was insane at the time of the incident. Also, during his defense, he presented evidence that his insanity was due to Vietnam related post-traumatic stress disorders. Simonson called witnesses that testified as follows. Richard Lock (Lock), a co-worker, testified that Simonson went through a lot of stress in Vietnam and had a drinking problem. Lock further testified that the night of the shooting, Simonson did not know what he was doing. Mrs. Simonson, Simonson's wife, testified that Simonson was a very "jumpy" person who constantly had nightmares, and always talked about "these men coming to get me." She testified that in her opinion Simonson was not sane at the time of the killings. Jeff Stock, a high school friend of Simonson,

testified that Simonson was not the same type of person he had known in high school. Vietnam had changed him, and now Simonson drank a lot and always wanted to fight. Neva Kaufield, Simonson's aunt, also testified that when he returned from Vietnam he was a changed person. Simonson's mother testified that there was a "drastic change" in Simonson after Vietnam. John Yost (Yost) and Tom Williams (Williams), psychologists who worked primarily with Vietnam Vets, examined Simonson and testified that Simonson had post-traumatic stress disorder. Therefore, the essence of the defense testimony was that Simonson had post-traumatic stress disorder and was not sane at the time of the incident.

■ It is well settled that a defendant *cannot* complain on appeal that he was prejudiced by evidence which he introduced into the case. The State is entitled to correct false impressions given to a jury by the defense through rebuttal testimony. *State v. Smith,* 92 N.M. 533, 591 P.2d 664 (1979); *see State v. Gardner,* 91 N.M. 302, 573 P.2d 236 (Ct.App.), *cert. denied,* 91 N.M. 249, 572 P.2d 1257 (1977).

■ During Simonson's defense, he presented evidence of insanity. Therefore, Simonson *cannot* argue about rebuttal evidence that tends to contradict the insanity defense. The admissibility of rebuttal evidence is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Manus; State v. Garcia,* 83 N.M. 794, 498 P.2d 681 (Ct.App.1972). After a review of the record, we find no abuse of the trial court's discretion. Furthermore, Simonson had the opportunity to cross-examine Gillespie or offer contradictory testimony on surrebuttal. NMSA 1978, Crim.P.R. 40 (Repl.Pamp. 1980).

## IV. *Lesser Included Offenses*

Simonson argues that the trial court erred in refusing to give an instruction on aggravated battery as a lesser included offense of attempted murder.

A lesser offense will be included within a greater offense only where the lesser offense is necessarily included in the greater offense charged in the indictment. *State v. DeMary*, 99 N.M. 177, 655 P.2d 1021 (1982). In determining whether the lesser offense is necessarily included, we must look at the particular circumstances of the case. *Id.*

Simonson was charged with the attempted murder of Maruch. The evidence shows that Simonson intended to kill Maruch, not injure him. When Simonson returned to his place of employment the night of the incident, Killingsworth saw Simonson and walked toward Simonson's truck. Killingsworth then got into Simonson's truck. At that time, Simonson said to Killingsworth, "I'm going to kill Maruch when he comes out." Killingsworth responded, "You don't want to do that, you would just get in trouble." Simonson then stated, "I'll have to shoot Howard, too, because Howard will be a witness and I can't have no witness." Then when Maruch came out of the building and got in his truck, Simonson grabbed his shotgun and pointed it at Maruch's face. Simonson shot at Maruch twice. One shot hit Maruch's truck and the other Maruch's shoulder.

After a review of the record, there is no showing that Simonson either intended to scare or intended to injure Maruch. The facts clearly show that Simonson intended to kill Maruch. Therefore, the trial court was correct in rejecting the aggravated battery instruction as a lesser included offense of attempted murder.

## Conclusion

Having found no error by the trial court or by the State, Simonson's convictions are affirmed.

IT IS SO ORDERED.

PAYNE, C.J., and SOSA, Senior Justice, concur.